## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

WILLIE ANTONIE WISE,                    )
                                        )
                        Petitioner,     )
                                        )
v.                                      )        Case No. 16-CV-0127-CVE-JFJ
                                        )
JOE ALLBAUGH,                           )
                                        )
                        Respondent.     )

## OPINION AND ORDER

Before the Court is the 28 U.S.C. § 2254 petition for writ of habeas corpus (Dkt. # 1) filed

by petitioner Willie Antonie Wise, a state inmate appearing pro se.[1]  Petitioner is serving two

consecutive terms of life without parole following his convictions, in the District Court of Tulsa

County, Case No. CF-2012-3414, on two counts of first degree murder.  He seeks habeas relief on

four grounds:  (1) the trial court erroneously admitted irrelevant and prejudicial gang evidence, (2)

the trial court plainly erred in omitting a jury instruction regarding the credibility of an informant,

(3) the prosecutor committed misconduct during direct examination of a state witness and during

closing argument, and (4) trial counsel provided ineffective assistance by failing to object to the

admission of gang evidence, failing to request the omitted instruction, and failing to object to

prosecutorial misconduct.  Respondent filed a response (Dkt. # 8) to the petition and provided the

state court records (Dkt. ## 8, 9, 10) necessary for the adjudication of petitioner's claims.  Petitioner

---

[1]      Because petitioner appears pro se, the Court will liberally construe his petition and reply.
Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991).  But the rule of liberal construction
does not permit the Court to "serve as his advocate" by creating arguments or searching the
record for facts to support his claims.  United States v. Pinson, 584 F.3d 972, 975 (10th Cir.
2009); Garrett v. Selby Connor Maddux & Janer, 425 F.3d 836, 840 (10th Cir. 2005).

filed a reply (Dkt. # 11). For the reasons discussed below, the Court denies the petition for a writ of habeas corpus.

***BACKGROUND***

Under 28 U.S.C. § 2254(e)(1), a state court's factual findings are presumed correct unless a habeas petitioner rebuts that presumption "by clear and convincing evidence." Following review of the state court record, trial transcripts, trial exhibits, and other materials submitted by the parties, the Court finds the following excerpt from the Oklahoma Court of Criminal Appeals' decision affirming petitioner's convictions and sentences accurately describes the underlying events that led to petitioner's charges. Therefore, the Court adopts the following summary as its own:

> [Petitioner] and Jeremy Foster were jointly charged in connection with a shooting at a Best Buy electronics store in Tulsa on July 14, 2012, which killed Scott Norman and Graydon Wesley Brown. The State alleged that the shooting was motivated by gang rivalry, and that Norman was the intended target. As Norman was entering the store, the gunman approached from the parking lot and fired several shots at him. Norman fell to the pavement at the store entrance. At the time, Mr. Brown was just inside the store with his ten-year-old daughter. Brown was hit in the chest by one of the bullets apparently intended for Norman. Both men died before reaching the hospital.
> Prompt investigation, including the review of surveillance video from Best Buy and other stores in the area, led police to suspect that a car operated by Shania Craven was involved in the shooting. Although she initially denied any knowledge of the incident, Craven eventually gave incriminating evidence against Jeremy Foster (her cousin) and [petitioner].

Dkt. # 8-4, Wise v. State, No. F-2014-343 (Okla. Crim. App. May 28, 2015) (unpublished) (hereafter, "OCCA Op."), at 1-2.[2]

In a second amended information filed November 20, 2012, in the District Court of Tulsa County, Case No. CF-2012-3414, the State charged petitioner and Foster, jointly, with two counts

---

[2]    For consistency, the Court's record citations refer to the CM/ECF header page number in the upper right-hand corner of each document.

of first degree murder, in violation of OKLA. STAT. tit. 21, § 701.7.  Dkt. # 9-20, Orig. Rec. vol. 1, at 82-86.  The State alleged that petitioner and Foster acted in concert on July 14, 2012, to shoot and kill Norman and Brown.  Id. at 82-83.  In February 2014, the trial court granted petitioner's request to sever his trial from Foster's.  Id. at 19.  Petitioner's case was tried to a jury in March 2014.  Id. at 20-21.  The following facts were developed at trial.

Norman and his brother, Jermarcho Norman, shopped at the Dillard's store in the Promenade Mall in Tulsa on July 14, 2012, before going to the Best Buy store at 5520 East Skelly Drive, Tulsa. Dkt. # 9-5, Tr. Trial vol. 3, at 216-17; Dkt. # 9-8, Tr. Trial vol. 6, at 9-14.  At trial, Jermarcho identified himself and Norman in still photographs captured from surveillance videos obtained from the Dillard's store.  Dkt. # 9-8, Tr. Trial vol. 6, at 12-13; see Dkt. # 9-9, at 34 (State's Exhibit 10); Dkt. # 9-10, at 1-2 (State's Exhibits 11, 12).  He testified that he was wearing a black shirt and that Norman was wearing a striped shirt.  Dkt. # 9-8, Tr. Trial vol. 6, at 12-13.

Foster and Craven made two trips to the Promenade Mall that same day.  Dkt. # 9-5, Tr. Trial vol. 3, at 111-13, 118-20.  Craven testified that Foster drove Craven's car, a black Chevy Malibu, both times.  Id. at 113, 119.  On the first trip, Foster and Craven went to a shoe store together, and Foster bought a pair of shoes.  Id. at 113-14.  On the second trip, the two entered the mall together, and Craven went alone to the shoe store to return Foster's shoes.  Id. at 119-20.  Foster and Craven later communicated by phone and agreed to meet at the food court.  When they spoke, Foster asked Craven if she had seen "a pregnant lady with a kid, and a guy with a . . . blue and gray or black and gray striped shirt."  Id. at 210-11.  She told him she had not.  Id. at 211.  Later, when Foster drove up in Craven's car to pick Craven up near the food court entrance, Craven saw petitioner seated in the front passenger seat of her car.  Id. at 122-23.  Craven testified that she knew petitioner because

they attended the same middle school in eighth grade and briefly "dated" during that time. Id. at 110. Petitioner got out of the car and sat in the back seat so Craven could sit in the front passenger seat. Id. at 123.

According to Craven, Foster then drove around the mall parking lot and parked in a parking garage near the south entrance to the Dillard's store. Dkt. # 9-5, Tr. Trial vol. 3, at 124-27. Petitioner got out and walked toward the entrance. Id. at 128. Foster then drove to a second location and parked near the north entrance to the Dillard's store. Id. at 128-30. Craven assumed she and Foster were waiting for petitioner. Id. at 129. When petitioner returned to Craven's car, he stated, "They going to Best Buy." Id. at 130-31. Foster then drove to the Best Buy store on Skelly Drive. Id. at 131-33, 216-17.

At trial, the State introduced surveillance videos obtained from the Promenade Mall, the Dillard's store, and the Best Buy store. See Dkt. # 9-9, at 35-39 (State's Exhibits 14, 15, 16, 18, 19, 95-conventionally filed compact discs).[3] Craven identified the black four-door car seen on surveillance video obtained from the Promenade Mall and the Best Buy store as her car. Dkt. # 9-5, Tr. Trial vol. 3, at 133-34. She also identified petitioner as the black male wearing a white jersey with a number on it who was seen in still photographs captured from the Dillard's video. Id. at 153-57; see Dkt. # 9-9, at 32-33, (State's Exhibits 7, 8). The videos from the Promenade Mall and the

---

[3]     At trial, State's Exhibit 95 was the video recording of petitioner's post-arrest interview. Dkt. # 9-7, Tr. Trial vol. 5, at 85-90. At trial, State's Exhibit 17 was a demonstrative exhibit depicting enlarged and highlighted versions of video obtained from the Best Buy surveillance camera overlooking the store's parking lot. Dkt. # 9-5, Tr. Trial vol 3, at 133-34; Dkt. # 9-8, Tr. Trial vol. 6, at 15. Due to a numbering error on direct appeal, the numbers for these two exhibits were transposed. Dkt. # 8, at 8 n.3. In this opinion, the Court refers to all conventionally filed compact discs as they are numbered in the record that was provided to this Court.

Dillard's store show petitioner (1) getting out of Craven's car while it was parked in a parking garage, (2) leaving the Dillard's store only moments after the Norman brothers walked out of the Dillard's store, and (3) walking from the Dillard's store to a mall parking garage. See State's Exhibits 14, 15, 16, 19 (second clip), 95.

Through Craven's testimony and surveillance video obtained from the Best Buy store, the State established that when Foster entered the Best Buy parking lot, he drove Craven's car past the marked parking spaces to the south side of the building and parked but left the car running. Dkt. # 9-5, Tr. Trial vol. 3, at 133-35; State's Exhibits 19 (second clip); State's Exhibit 95. Craven testified that petitioner got out of the car and was gone for "[a] minute; two at the most." Dkt. # 9-5, Tr. Trial vol. 3, at 135-36. Although he disappeared from Craven's view, the video shows petitioner (1) walking through the parking lot and hiding between parked cars, (2) approaching the Norman brothers just before they reached the store entrance, (3) raising a handgun in the air with his left hand, (4) shooting Norman in the back, and (5) running toward the south side of the building immediately after the shooting. State's Exhibit 19 (second clip); State's Exhibit 95.[4]

Craven testified that when petitioner returned to the car, Foster sped away. Dkt. # 9-5, Tr. Trial vol. 3, at 136-37. As Foster drove away from the Best Buy store, Craven heard petitioner tell Foster, "Bro, I got him" and "Don't let them catch us." Id. at 140, 142. Craven testified that petitioner also described how he hid in the parking lot, approached the Norman brothers, and stated, "G-I-P Hyphy," before firing several shots. Id. at 142-43. Petitioner also told Foster that the first

---

[4]     A surveillance video from a camera located inside the Best Buy store shows the second victim, Brown, falling to the floor and clutching his chest after being struck by one bullet. Dkt. # 9-5, Tr. Trial vol. 3, at 234-37; State's Exhibit 19 (first clip). It also shows a store employee escorting Brown's daughter away from her father as two customers performed CPR on Brown. State's Exhibit 19 (first clip).

shot shattered the window and that Norman's brother took off running toward the back of the store. Id. at 143-44.[5] According to Craven, petitioner also said that he would "have a stripe" from the shooting. Id. at 145. Craven testified that she "grew up in North Tulsa," she was familiar with the Hoover Crips through Foster's association with that gang, and she understood the phrase "getting a stripe" to mean that the person committed a violent crime. Id. at 145-46. Finally, Craven testified that she knew Tajuan "Hyphy" Davis, she knew that he had been murdered, and she and Foster attended Davis's funeral. Id. at 162-63. The State introduced a copy of the program from Davis's funeral listing Foster as an honorary pallbearer. Id.; see Dkt. # 9-18, at 2 (State's Exhibit 135).

To explain Craven's testimony regarding some of the statements petitioner made after the shooting and to support its theory that the shooting was gang-related, the State presented testimony from Sergeant Sean Larkin of the Tulsa Police Department's Gang Unit. Dkt. # 9-8, Tr. Trial vol. 6, at 49, 51. Larkin testified that petitioner, Foster, and the Norman brothers were known members of the Hoover Crips. Id. at 74, 85-92. He testified that petitioner was affiliated with the 57th Street Hoover Crips whereas Norman was a 107 Hoover Crip. Id. at 85-86.[6] Larkin provided general information about the Hoover Crips as well, including testimony (1) that the Hoover Crips originated in California and expanded from the West Coast to the Midwest "[w]hen crack cocaine turned into an epidemic across the country," (2) that "Hoovers and other gangs, they brought their enterprise

---

[5] A surveillance video from a camera located inside the Best Buy store depicts a window near the store entrance shattering and Jermarcho running into the store. State's Exhibit 18.

[6] Craven testified that Foster was associated with a set of the Hoover Crips known as "Tre-9." Dkt. # 9-5, Tr. Trial vol. 3, at 146. The State also presented evidence that Foster has a tattoo on his right forearm memorializing Davis's death: a tombstone engraved "Hyphy 6-3." Dkt. # 9-8, Tr. Trial vol. 6, at 91-92, 95. Larkin testified that "6-3" signifies that Davis was a 63rd Street Hoover. Id. at 95.

here to Tulsa where they set up shop to sell drugs," and (3) that there are over 2,000 documented Hoover Crips in Tulsa County. Id. at 64-65.

Larkin also testified about past gang-related shootings involving Norman. According to Larkin, Norman survived a shooting in May 2008 and Davis was a suspect in that shooting. Id. at 78. Davis was murdered on July 9, 2008; Norman and Bryan Mitchell were suspects in that shooting. Id. Larkin testified that, after Davis died, several gang members made a rap video and published it on YouTube to encourage retribution for Davis's murder. Id. at 79-80. Larkin testified that on July 10, 2011, Mitchell was the victim of a double homicide in his home. Id. at 80-81. He also testified, based on his training and experience, that anniversary dates of murders are significant to gang members. Id. at 73-74.

Regarding gang culture, Larkin testified that the phrase "putting in work" "basically means to commit a crime. . . . And it could be anything from doing robberies, shootings on rival gang members, you know, settling disputes within your gang, things of that nature." Id. at 67-68. He also testified that the acronym "G.I.P." can mean "gangster in paradise," "gangster in peace," or "grooving in peace." Id. at 68. Based on his training and experience, Larkin testified that if petitioner stated "GIP Hyphy" before he shot Norman, petitioner likely did so to reflect that the shooting "was done in remembrance or for retaliation for" Davis's murder. Id. at 98.

The State also introduced at trial the recording of Petitioner's post-arrest interview with Detective Jason White. Dkt. # 9-7, Tr. Trial vol. 5, at 63, 85-90; State's Exhibit 17. During the interview, petitioner denied knowledge of his whereabouts on the day of the shooting, denied knowledge of whether he was with Foster and Craven that day, claimed he never heard of Tajuan "Hyphy" Davis, stated he could not recall the last time he was at the Promenade Mall, and stated he

had "never in his life" been to a Best Buy store. State's Exhibit 17. He admitted, however, that he is left-handed. Id.

At the conclusion of the five-day trial, the jury found petitioner guilty of both counts of first degree murder and recommended a sentence of life without parole for each conviction. Dkt. # 9-8, Tr. Trial vol. 6, at 206-08.[7] The trial court sentenced petitioner accordingly and ordered the sentences to be served consecutively. Dkt. # 9-19, Tr. Sent. Hr'g, at 21-22.

Represented by counsel, petitioner filed a direct appeal with the Oklahoma Court of Criminal Appeals (OCCA), raising four propositions of error:

| | |
|---|---|
| Proposition One: | The trial court erred in permitting the introduction of certain irrelevant and unfairly prejudicial gang evidence. |
| Proposition Two: | The trial court committed plain error in failing to give Instruction No. 9-43, OUJI-CR(2d) (Supp. 2000) evidence-credibility of informers. |
| Proposition Three: | Prosecutorial misconduct deprived [petitioner] of a fair trial. |
| Proposition Four: | The [petitioner] was deprived of effective assistance of counsel. |

Dkt. # 8-2, Pet'r App. Br., at 2 (full capitalization of issue statements omitted). By unpublished opinion filed May 28, 2015, in Case No. F-2014-343, the OCCA rejected each alleged error on the merits and affirmed petitioner's convictions and sentences. Dkt. # 8-4, OCCA Op., at 2-7.

---

[7] After petitioner's trial, Foster pleaded guilty to two counts of being an accessory after the fact to murder, in violation of OKLA. STAT. tit. 21, § 175, after former conviction of two or more felonies. Dkt. # 9-21, Orig. Rec. vol. 2, at 63-70. The trial court imposed two 40-year prison terms and ordered them to be served concurrently. Id. at 68.

Petitioner filed the instant federal habeas petition on March 2, 2016. Dkt. # 1, at 1. Relying on the arguments from his direct appeal brief, petitioner seeks federal habeas relief on the same four grounds he presented to the OCCA. Dkt. # 1, at 5-10, 16-41. In response to the petition, respondent argues that petitioner is not entitled to federal habeas relief. Dkt. # 8.

## DISCUSSION

### I. Legal framework

Under the Antiterrorism and Effective Death Penalty Act (AEDPA), a federal court may grant a state prisoner's request for federal habeas relief "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The AEDPA requires a state prisoner "to provide the state courts with a 'fair opportunity' to apply controlling legal principles to the facts bearing upon his constitutional claim." Anderson v. Harless, 459 U.S. 4, 6 (1982) (quoting Picard v. Connor, 404 U.S. 270, 276-77 (1971)); see 28 U.S.C. § 2254(b) (requiring state prisoner to exhaust available state remedies). When a state court rejects a state prisoner's constitutional claim on the merits, a federal court may not grant habeas relief on that claim unless the petitioner first demonstrates that the state court's adjudication of the claim either "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law," id. § 2254(d)(1),[8] or "(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," id. § 2254(d)(2).

---

[8] As used in § 2254(d)(1), the phrase "clearly established Federal law" means "the governing legal principle or principles" stated in "the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003) (quoting Terry Williams v. Taylor, 529 U.S. 362, 412 (2000) (Terry Williams)).

"To determine whether a particular decision is 'contrary to' then-established law, a federal court must consider whether the decision 'applies a rule that contradicts [such] law' and how the decision 'confronts [the] set of facts' that were before the state court." Cullen v. Pinholster, 563 U.S. 170, 182 (2011) (alterations in original) (quoting Terry Williams, 529 U.S. at 405, 406). "If the state-court decision 'identifies the correct governing legal principle' in existence at the time, a federal court must assess whether the decision 'unreasonably applies that principle to the facts of the prisoner's case.'" Id. (quoting Terry Williams, 529 U.S. at 413). Under § 2254(d)(1), the federal court must find that the state court's application of the law was "'objectively unreasonable,' not merely wrong; even clear error will not suffice." White v. Woodall, 572 U.S. 415, 419 (2014) (quoting Lockyer, 538 U.S. at 75-76). Similarly, under § 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." Wood v. Allen, 558 U.S. 290, 301 (2010).

"As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings." Harrington v. Richter, 562 U.S. 86, 102 (2011). Ultimately, to obtain federal habeas relief on claims subject to review under § 2254(d), "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 103. By design, this showing is difficult to make because "habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." Id. at 102-03 (quoting Jackson v. Virginia, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring in judgment)).

## II.    Analysis

As stated, petitioner seeks habeas relief on four grounds: (1) the trial court erroneously admitted irrelevant and prejudicial gang evidence, (2) the trial court plainly erred in omitting a jury instruction regarding the credibility of an informant, (3) the prosecutor committed misconduct during direct examination of a state witness and during closing argument, and (4) trial counsel provided ineffective assistance by failing to object to the admission of gang evidence, failing to request the omitted instruction, and failing to object to prosecutorial misconduct. Dkt. # 1, at 31-41.

Respondent concedes, and the Court finds, that petitioner timely filed his habeas petition, see 28 U.S.C. § 2244(d)(1)(A), and exhausted each of his habeas claims by presenting them to the OCCA on direct appeal, see id. § 2254(b)(1)(A). Dkt. # 8, at 2. Respondent contends, however, that § 2254(d) bars relief as to all four claims because petitioner cannot show that the OCCA's adjudication of those claims resulted in a decision that is based on either an unreasonable application of clearly established federal law or an unreasonable determination of the facts.[9] Dkt. # 8, at 12-35.

### A.    Admission of gang evidence

Petitioner first claims that the trial court violated his Fourteenth Amendment right to due process by admitting irrelevant and prejudicial gang evidence. Dkt. # 1, at 31-34. He specifically challenges the admission of Sergeant Larkin's testimony (1) that Hoover Crips came from the West

---

[9]    Respondent also contends petitioner's first two claims allege only state law errors that are not cognizable on habeas review. Dkt. # 8, at 12-15, 18-20; see Wilson v. Corcoran, 562 U.S. 1, 5 (2010) ("[I]t is only noncompliance with *federal* law that renders a State's criminal judgment susceptible to collateral attack in the federal courts."). However, respondent acknowledges (1) that petitioner asserted on direct appeal that both alleged trial errors violated his constitutional right to due process and (2) that, by reviewing both alleged errors for plain error, the OCCA effectively adjudicated the merits of petitioner's due process claims. Dkt. # 8, at 15-16, 20. Thus, for efficiency's sake, the Court will review all four claims under § 2254(d).

Coast to the Midwest primarily to sell crack cocaine, (2) that there are over 2,000 documented Hoover Crips in Tulsa County, (3) that gangs use the phrase "put in work" to describe "committing a crime such as doing robberies, shootings on rival gang members, and settling disputes within your gang," and (4) that Norman and Mitchell were suspected of killing Davis before Mitchell was murdered. Dkt. # 1, at 32-34.

Citing petitioner's failure to object at trial to the admission of this evidence, the OCCA reviewed petitioner's claim for plain error and rejected it. Dkt. # 8-4, OCCA Op., at 2-4. The OCCA found (1) that the "[t]he trial court held an extensive hearing" on the admissibility of gang evidence before trial and (2) that the trial court concluded, consistent with state law, that evidence of petitioner's gang membership and some "gang-culture" evidence was relevant to explain motive for the shooting and to help the jury understand Craven's testimony. Id. at 2-4. The OCCA further found that the trial court "was extremely conscientious about keeping the gang-culture testimony relevant and to a minimum, to avoid unfair prejudice." Id. at 4. Finally, the OCCA found that the trial court blunted the prejudicial impact of gang evidence by "caution[ing] the jury on the limited use of this evidence when it was presented." Id. at 4.

To obtain federal habeas relief on the basis of an alleged evidentiary error, petitioner must establish that the alleged error "was 'so grossly prejudicial [that it] fatally infected the trial and denied the fundamental fairness that is the essence of due process.'" Revilla v. Gibson, 283 F.3d 1203, 1212 (10th Cir. 2002) (alteration in original) (quoting Fox v. Ward, 200 F.3d 1286, 1296 (10th Cir. 2000)); see also Thornburg v. Mullin, 422 F.3d 1113, 1128-29 (10th Cir. 2005) ("Federal habeas review is not available to correct state law evidentiary errors; rather it is limited to violations of constitutional rights." (quoting Smallwood v. Gibson, 191 F.3d 1257, 1275 (10th Cir. 1999)). "An

inquiry into the fundamental fairness of the trial requires an examination of the entire proceedings, including the strength of the evidence against the defendant." Hanson v. Sherrod, 797 F.3d 810, 843 (10th Cir. 2015).

By reviewing petitioner's challenge to the admission of gang evidence for plain-error, the OCCA identified and applied the correct legal principle governing his due-process claim. See Hancock v. Trammell, 798 F.3d 1002, 1011 (10th Cir. 2015) ("Oklahoma's formulation of the plain-error standard is virtually identical to the constitutional test for due process."). As a result, this Court must defer to the OCCA's ruling unless its application of that standard was objectively unreasonable. White, 572 U.S. at 419; Pinholster, 563 U.S. at 182; see also Thornburg, 422 F.3d at 1125 (reviewing whether alleged evidentiary error violated due process and stating, "[b]ecause the OCCA applied the same test we apply to determine whether there has been a due-process violation, we must defer to its ruling unless it 'unreasonably appli[ed]' that test" (alteration in original) (quoting 28 U.S.C. § 2254(d))).

Petitioner does not argue that the OCCA unreasonably applied the federal due process standard in rejecting his claim. Regardless, petitioner would not prevail on that argument. The record reflects that before petitioner's trial, the State filed a notice of intent to present evidence of petitioner's gang membership. Dkt. # 9-20, Orig. Rec. vol. 1, at 126-41. The State alleged that petitioner, Foster, and the Norman brothers are associated with different sets of the "Crips," that the shooting appeared to be gang-related with Norman as the intended target, and that evidence of gang membership was thus relevant to explain motive for the shooting. Id. As the OCCA found, the trial court held a pretrial hearing on the admissibility of gang evidence. Dkt. # 9-2, Tr. Mot. Hr'g (Feb. 28, 2014), at 1. At the hearing, the State argued evidence of gang membership and gang culture was

also relevant to help the jury understand Craven's testimony—particularly her testimony as to statements petitioner made immediately after the shooting. Id. at 8-11. At the conclusion of the hearing, the trial court ruled that it would allow the State to present evidence of petitioner's "gang membership, along with brief explanation of [gang] culture to establish for the jury an understanding of the motive and reason for [the shooting]." Id. at 107. The trial court also found the evidence relevant to provide context for Craven's testimony and that the probative value of this evidence "greatly outweigh[ed] any prejudicial effect." Id. at 107-08.[10]

Like the jury, this Court viewed the surveillance videos from the Dillard's store and the Best Buy store. Those videos, combined with petitioner's statements, "They going to Best Buy" and "Bro, I got him," provided compelling evidence that Norman was petitioner's intended target. What that evidence failed to convey is why. Craven testified that after the shooting petitioner (1) discussed with Foster that he might get "a stripe" for the shooting and (2) told Foster that immediately before shooting Norman, petitioner said "G-I-P Hyphy." Dkt. # 9-5, Tr. Trial vol. 3, at 142-43. While Craven testified that Foster was in a gang, that she and Foster knew Davis (a.k.a. "Hyphy") and attended his funeral, and that she understood "getting a stripe" to mean committing a crime of violence, id. at 142-43, 162-64, Larkin's testimony provided further context for her testimony. Thus, contrary to petitioner's argument, Larkin's testimony that Norman and Mitchell were suspected of

---

[10]     At the evidentiary hearing, the State introduced testimony about and a copy of the rap video created by gang members to honor Davis and encourage retribution for his murder. Dkt. # 9-2, Tr. Mot. Hr'g (Feb. 28, 2014), at 20, 51; State's Exhibit 108. Larkin testified at the hearing that he had viewed the video several times, that one of petitioner's known associates was in the video, and that petitioner was not in the video. Dkt. # 9-2, at 20, 79. The trial court ruled that the State could present testimony at trial about the video and its references to Davis, but that it could not introduce the video itself at trial because the video was more prejudicial than probative. Id. at 113-15.

killing Davis, that Mitchell was murdered sometime after Davis, and that the acronym "G.I.P." means "gangster in paradise" and is an expression sometimes used before a retaliatory shooting was highly relevant (1) to explain why petitioner, a known associate of Foster, targeted Norman and (2) to provide context for Craven's testimony that petitioner told Foster he stated "G-I-P Hyphy" before he shot Norman. Arguably, Larkin's testimony regarding the origins of the Hoover Crips, the gang's membership numbers in Tulsa County, and the phrase "putting in work" could be viewed as less relevant. Nonetheless, in the context of the entire proceeding, even if irrelevant this evidence was not prejudicial. See Hanson, 797 F.3d at 943 (noting that due-process analysis requires consideration of entire proceedings and strength of evidence against defendant). Furthermore, as the OCCA found, any potential prejudice arising from the admission of gang evidence was mitigated when the trial court gave a limiting instruction—both before Larkin testified and after the close of all evidence—telling the jury that it could consider that evidence only as proof of motive and intent. Dkt. # 9-8, Tr. Trial vol. 6, at 48-49; Dkt. # 9-21, Orig. Rec. vol. 2, at 23 (Instruction No. 18). And, consistent with that instruction, the prosecutor reminded the jury during closing argument that it would be improper to use gang evidence to "say, okay, this guy is a gang-banger; he's a bad guy, and so he killed somebody else" but it would be proper to "use the evidence with regard to his gang involvement to show motive and intent." Dkt. # 9-8, Tr. Trial vol. 6, at 131-32.

In sum, on the record presented, petitioner cannot show that the admission of the challenged evidence deprived him of a fair trial or that fairminded jurists would disagree with the OCCA's rejection of his due-process claim. Thus, the Court denies the habeas petition as to petitioner's first claim.

## B.    Omission of cautionary jury instruction

Next, petitioner contends he was denied his Fourteenth Amendment right to a fair trial

because the trial court failed to provide an unrequested instruction advising the jury to consider an

informant's testimony with caution.  Dkt. # 1, at 34-37; Dkt. # 11, at 2-4.  He argues that Craven was

an informant and, because she was the only eyewitness who identified him as the shooter,[11] the trial

court plainly erred by failing to give the following instruction based on Oklahoma Uniform Jury

Instruction Criminal (OUJI-CR) (2d) No. 9-43:

> The testimony of an informer who provides evidence against a defendant for personal advantage must be examined and weighed by you with greater care than the testimony of the ordinary witness.  Whether the informer's testimony has been affected by interest or by prejudice against the defendant is for you to determine.

Dkt. # 1, at 35-36.

Applying plain-error review, the OCCA rejected petitioner's claim that the omission of this

instruction deprived him of a fair trial.  In doing so, the OCCA declined to decide whether Craven

"could properly be labeled as an 'informant,'" because it found "no reasonable probability that the

omission of OUJI-CR (2nd) No. 9-43 affected the outcome of [petitioner's] trial."  Dkt. # 8-4,

OCCA Op., at 4-5.  The OCCA reasoned that it was apparent from Craven's testimony that (1) she

---

[11]    An eyewitness to the shooting, Eric McAuliff, testified at trial that he walked out of the Best Buy store just before the shooting, saw the shooter, and called 911 immediately after the shooting.  Dkt. # 9-5, Tr. Trial vol. 3, at 254-60.  In the 911 call that was played for the jury, McAuliff described the shooter as a black male, about 5 feet 8 inches tall, "skinny," probably about 175 pounds or less, with a beard and two-inch afro, wearing a white t-shirt "like a soccer jersey with a number on it."  Id. at 258-60; State's Exhibit 20.  At trial, however, McAuliff did not identify petitioner as the shooter; the State did not ask McAuliff to do so. Nevertheless, as discussed, Craven did identify petitioner as the shooter at trial.  In addition, the jury viewed several surveillance videos depicting petitioner, as described by Craven and McAuliff, and the jury viewed petitioner in the courtroom throughout the five-day trial. Thus, the jury was not required to rely solely on Craven's identification to reach its verdict.

had a "possible motive to fabricate" her testimony, (2) she initially lied to police about her involvement in the shooting, and (3) she "was jailed as an accessory and/or a material witness." Id. at 5. The OCCA further reasoned that omitting the informant instruction did not prejudice petitioner because the trial court gave other instructions that (1) "cautioned [the jury] to consider the possible biases of every witness," (2) "reminded [the jury] that Craven's testimony was inconsistent with her initial statements to police, wherein she denied any knowledge of the shooting," and (3) "cautioned the jurors that Craven could be considered an accomplice to the murders, and that if they so found, her testimony had to be corroborated in some material respect before it could support a conviction." Id.

"As a general rule, errors in jury instructions in a state criminal trial are not reviewable in federal habeas corpus proceedings, 'unless they are so fundamentally unfair as to deprive petitioner of a fair trial and to due process of law.'" Tyler v. Nelson, 163 F.3d 1222, 1227 (10th Cir. 1999) (quoting Nguyen v. Reynolds, 131 F.3d 1340, 1357 (10th Cir. 1997)). "The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal." Henderson v. Kibbe, 431 U.S. 145, 155 (1977). And, when the instruction error alleged arises from the trial court's omission of an instruction, the petitioner's "burden is especially heavy." Id.

By reviewing petitioner's alleged instruction error for plain error, the OCCA identified the correct legal principle governing his due-process claim. Hancock, 798 F.3d at 1011. Thus, the only

question for this Court is whether the OCCA unreasonably applied that principle when it rejected petitioner's claim. Thornburg, 422 F.3d at 1125.[12]

As with his first claim, petitioner fails to argue that the OCCA unreasonably applied the federal due process standard. Even if he had made that argument, the Court would reject it. Under the circumstances of this case, it was objectively reasonable for the OCCA to determine that the jury was both (1) aware of the need to carefully consider Craven's credibility and (2) properly instructed on how to do so. Craven testified at trial that she was with petitioner and Foster when Foster drove Craven's car from the Promenade Mall to the Best Buy store before the shooting and when Foster drove Craven's car away from the Best Buy after the shooting. Dkt. # 9-5, Tr. Trial vol. 3, at 111-45. Craven also testified that she was arrested a few days after the shooting as an accessory after the fact to murder, that she was not truthful in her first post-arrest interview, and that after she spent some time in jail she agreed to provide a truthful statement about the shooting. Id. at 158-61. On cross-examination, defense counsel thoroughly examined Craven about her inconsistent statements and her reasons for providing the second interview and generally attacked her credibility. Id. at 167-69, 175-210. And, as the OCCA reasoned, the trial court provided several jury instructions specifically advising the jury to view Craven's testimony with caution, including one advising the jury that if it

_____

[12] Notably, the Supreme Court's discussion in Kibbe regarding the weighty burden a petitioner bears to obtain habeas relief on an alleged instruction error predates the AEDPA's enactment by nearly 20 years. Section 2254(d) thus adds more weight to that burden by requiring a petitioner to first demonstrate that the state court's application of federal law in rejecting an instruction-based-due-process claim was objectively unreasonable. See White, 572 U.S. at 419.

determined Craven was an accomplice, it must find other evidence corroborating her testimony before it could find petitioner guilty.[13] See Dkt. # 9-21, Orig. Rec. vol. 2, at 13, 27, 29-34.

In short, fairminded jurists would not disagree with the OCCA's decision that the omission of the unrequested informant instruction did not deprive petitioner of a fair trial. Thus, the Court denies the habeas petition as to petitioner's second claim.

### C.    Prosecutorial misconduct

In his third claim, petitioner contends that prosecutorial misconduct deprived him of his Fourteenth Amendment right to a fair trial. Dkt. # 1, at 37-39. He specifically argues that the prosecutor "appealed to 'societal alarm'" (1) by asking improper questions to introduce irrelevant

---

[13]    Even assuming the jury found Craven was an accomplice, the State presented more than sufficient evidence to corroborate her testimony. As discussed in the background section of this opinion, surveillance videos obtained from the Promenade Mall, the Dillard's store, and the Best Buy store captured images of (1) petitioner as he followed the Norman brothers through the Dillard's store, (2) Craven's car as it drove through the Best Buy parking lot an disappeared behind the south side of the building, (3) petitioner emerging from the south side of the building, (4) petitioner hiding between cars in the Best Buy parking lot as he moved toward the store entrance, (5) petitioner running up behind the Norman brothers and shooting Norman in the back before running toward the south side of the building, and (6) Brown, the second victim, falling to the floor inside the store after being struck by a bullet intended for Norman. It is not clear how Craven's testimony could have been better corroborated than with video recordings from cameras that provided eyes on petitioner when he was out of Craven's view and that synchronized seamlessly with her testimony regarding the events that she described as occurring immediately before and immediately after the shooting. In addition, in the 911 call he made immediately after the shooting, McAuliff described the shooter as possessing strikingly similar characteristics to petitioner and as wearing the same clothing that Craven testified petitioner wore on the day of the shooting. This evidence further confirms that there was nothing objectively unreasonable about the OCCA's rejection of petitioner's due-process claim.

and prejudicial gang evidence through Sergeant Larkin's testimony and (2) by stating during the initial closing argument that Norman and Mitchell[14] were denied due process. Dkt. # 1, at 37-38.

The OCCA rejected petitioner's prosecutorial-misconduct claim on plain-error review. The OCCA reiterated that the trial court properly admitted Larkin's testimony and reasoned that the prosecutor's questions eliciting that testimony were, therefore, "entirely proper." Dkt. # 8-4, OCCA Op., at 6. Placing the challenged closing remark in context, the OCCA noted that the prosecutor stated,

> You are here for justice. You are here to look at the evidence in a cold, dispassionate way so that you dispense due process. *Due process. That was something that was denied to Scott Norman; something that was denied to Bryan Mitchell.* This is not about retaliation. This is about seeking justice; the type of justice that each one of you is responsible for; the type of justice which happens in an open courtroom in the United States of America.

Id. at 6 (emphasis added; footnote omitted); see also Dkt. # 9-8, Tr. Trial vol. 6, at 126-27. The OCCA rejected petitioner's argument that this statement was intended to invoke societal alarm, reasoning, "The fact that [petitioner] would fire gunshots into the entrance of a busy retail establishment, putting many innocent people at risk, to avenge someone else's death and gain respect among his peers in the process, was alarming in itself." Dkt. # 8-4, OCCA Op., at 6. The OCCA further reasoned that the prosecutor's closing argument, "read as a whole," did "not ask the jury to punish [petitioner] for anything but his own actions" and "did not affect [petitioner's] substantial rights." Id. at 6-7.

To obtain federal habeas relief on a prosecutorial-misconduct claim, petitioner must show, in light of the "entire proceedings," that the prosecutor's alleged misconduct "so infected the trial

---

[14]     As a reminder, Mitchell was murdered in July 2011 and, like Norman, was suspected of killing Davis. Dkt. # 9-8, Tr. Trial vol. 6, at 78-81.

with unfairness as to make the resulting conviction a denial of due process." <u>Donnelly v.</u> <u>DeChristoforo</u>, 416 U.S. 637, 643 (1974). By itself, this standard erects a "high hurdle." <u>Banks v.</u> <u>Workman</u>, 692 F.3d 1133, 1148 (10th Cir. 2012). Coupled with § 2254(d), the standard is "doubly deferential." <u>Id.</u>

In rejecting petitioner's prosecutorial-misconduct claim, the OCCA applied the correct legal principles from <u>Donnelly</u> by considering the challenged conduct in light of the entire proceedings. Dkt. # 8-4, OCCA Op., at 6-7. Yet, petitioner fails to identify any aspect of the OCCA's decision on this claim that is objectively unreasonable. And the Court finds none. As the OCCA reasoned, the prosecutor did not commit misconduct by eliciting admissible evidence. And, in light of the entire proceeding and the overwhelming evidence of petitioner's guilt, it was objectively reasonable for the OCCA to conclude that the prosecutor's challenged closing remark did not infect the entire proceeding. As a result, the Court denies the habeas petition as to petitioner's third claim.

### D.     Ineffective assistance of trial counsel

In his fourth and final claim, petitioner alleges trial counsel was ineffective in three respects: (1) for failing to object to the allegedly erroneous admission of gang evidence, (2) for failing to request an informant instruction, and (3) for failing to object to the prosecutor's alleged misconduct. Dkt. # 1, at 39-41.

Applying <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), the OCCA rejected petitioner's claim, stating,

> We have already found that evidence of gang culture was limited, relevant, and entirely proper, that the prosecutor's comments on that evidence were also proper, and that the lack of a cautionary instruction on informant credibility was unnecessary. Having found no reasonable probability that any of the preceding claims of error affected the outcome of [petitioner's] trial, we cannot find trial counsel ineffective.

Dkt. # 8-4, OCCA Op., at 7.

Criminal defendants have a constitutional right to the effective assistance of counsel. U.S. Const. amend. VI; Strickland, 466 U.S. 668, 688, 692 (1984). Under Strickland, a defendant alleging ineffective assistance of counsel must show that counsel's performance was deficient and that counsel's deficient performance resulted in prejudice. 466 U.S. at 692. But because the OCCA applied Strickland, petitioner must overcome § 2254(d)'s bar to habeas relief by showing either (1) that the OCCA's application of Strickland to the facts of his case was objectively unreasonable or (2) that its decision was based on an unreasonable determination of the facts. Pinholster, 563 U.S. at 182; 28 U.S.C. § 2254(d); see also Richter, 562 U.S. at 101 (noting that on habeas review, "[t]he pivotal question is whether the state court's application of the Strickland standard was unreasonable. This is different from asking whether defense counsel's performance fell below Strickland's standard.").

Petitioner does not attempt to make, and thus fails to make, either showing. Under the facts of this case, it was objectively reasonable for the OCCA to conclude that trial counsel did not perform deficiently by failing (1) to object to the admission of admissible gang evidence (2) to request an unnecessary jury instruction, or (3) to object to the prosecutor's permissible questions and closing argument. Moreover, even if counsel's performance could be considered deficient, the OCCA's determination that petitioner failed to establish prejudice is not "so lacking in justification" that fairminded jurists would disagree with it. Richter, 562 U.S. at 103. Thus, the Court denies the habeas petition as petitioner's fourth claim.

*CONCLUSION*

Based on the foregoing analysis, the Court concludes that petitioner is not entitled to federal habeas relief and, therefore, denies his petition for a writ of habeas corpus.

**Certificate of Appealability**

Rule 11, Rules Governing Section 2254 Cases in the United States District Courts, instructs that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." A district court may issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When the district court rejects a petitioner's constitutional claims on the merits, the applicant must make this showing by demonstrating "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000). Because the Court finds that reasonable jurists would not debate the correctness of its assessment of petitioner's four habeas claims, the Court declines to issue a certificate of appealability.

**ACCORDINGLY, IT IS HEREBY ORDERED** that:

1.   The petition for a writ of habeas corpus (Dkt. # 1) is **denied**.

2.   A certificate of appealability is **denied**.

3.   A separate judgment shall be entered in this case.

**DATED** this 7th day of February, 2019.

_Claire V. Eagle_
CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE